**REPUBLIC SUPPLY CORPORATION,**
a Michigan corporation, Plaintiff,

v.

**LEWYT CORPORATION, a foreign corporation, Defendant.**

**Civ. No. 17200.**

United States District Court
E. D. Michigan, S. D.

March 20, 1958.

11. Fay v. Douds, 2 Cir., 1949, 172 F.2d 720, 723.

12. Cf. Nagler v. Admiral Corporation, 2 Cir., 1957, 248 F.2d 319.

**950**

Sullivan, Elmer, Eames & Moody, Detroit, Mich., for plaintiff.

Hill, Lewis, Andrews, Granse & Adams, Detroit, Mich., for defendant.

O'SULLIVAN, District Judge.

This suit was removed to this court from the Wayne County Circuit Court. Following removal, defendant filed a Motion to Quash, Vacate and Set Aside Service of Process, upon the principal ground that defendant, a foreign corporation, was not doing business in Michigan so as to make it amenable to the service of process in this state. The motion also asserts that Melvin J. Reibert, upon whom service was had, was not a person upon whom service could be had, and that the summons was fatally defective

on its face. Neither of these latter two grounds was relied on by the defendant in oral argument or brief; and the Court, in any event, is of the opinion that they are without merit.

 Affidavits filed in support of, and in opposition to, defendant's motion raised issues of fact, upon which oral testimony was taken. The testimony brought out facts additional to those set forth in the affidavits. This practice is procedurally in keeping with both Federal Rules (Rule 43(e), 28 U.S.C.A.) and the Michigan Statutes (M.S.A. § 27.988, C.L.1948, § 618.8). Under Rule 52 of the Federal Rules of Civil Procedure, it is not necessary that the Court make Findings of Fact and Conclusions of Law upon disposition of the motion now before the Court. However, because the Court feels that some issues of fact need resolution as background to decision on this motion, the Court's recital of any fact should be understood to be the Court's Finding, wherever such fact was a matter in issue.

This Court is of the opinion that the defendant was doing business in Michigan to an extent which made it amenable to the process now under attack by the defendant. The question here involved has been considered in many decisions. These decisions supply no rigid formula which can be invoked to make easy a determination of the question in the varying factual situations which are presented.

"No all-embracing rule as to what is 'doing business' has been laid down. The question is one of fact, and it is to be determined largely according to the facts of each individual case rather than application of fixed, definite, and precise rules." 14A C.J., p. 1372; 20 C.J.S. Corporations § 1920.

"It is recognized that no exact test can be prescribed but each case must stand on its own facts." Watson-Higgins Milling Co. v. St. Paul Milling Co., 256 Mich. 258, at page 259, 239 N.W. 295, at page 296.

This Court recognizes the generality that mere solicitation of sales by a foreign corporation within a particular state through salesmen entering such state, and shipment of goods into that state to fill said orders, do not constitute doing business so as to subject the selling corporation to the process of the state from which the orders were solicited. Recent decisions, however, hold that it takes little more than such selling activity to result in the selling corporation being legally found in the state doing business and subject to its process. The following language of Justice Rutledge in the case of Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511, at page 515, 146 A.L.R. 926, emphasizes this trend of recent decisions:

"It is now recognized that maintaining many kinds of regular business activities constitutes 'doing business' in the jurisdictional sense, notwithstanding they do not involve concluding contracts. In other words, the fundamental principle underlying the 'doing business' concept seems to be the maintenance within the jurisdiction of a regular, continuous course of business activities, whether or not this includes the final stage of contracting * * and very little more than 'mere solicitation' is required to bring about this result."

The briefs of both parties indicate counsels' conclusion that the law of Michigan should control the decision of this case. The Michigan court has adopted the rule that not a great deal more than mere solicitation is required to sustain Michigan's jurisdiction of a foreign corporation. While the facts in the case of Dobson v. Maytag Sales Corporation, 292 Mich. 107, 290 N.W. 346, are not exactly in point with the case at bar, and the activities of that defendant corporation were, to some extent, different in kind from, and more extensive than, the activities of defendant in this case, it is this Court's opinion that the activities of the Maytag Sales Corporation in the Dobson case were sufficiently like the activities of Lewyt Corporation here to justify using the reasoning of the Dobson case in deciding the instant motion.

If it is necessary to find harmony between the Michigan law and Federal decisions, it seems clear that the United States Supreme Court in the case of International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, announces the Federal rule to be the same, in broad principle, with that of Michigan. A recital of the facts in the International Shoe Co. case demonstrates that the activities there under consideration were not unlike the activities of Lewyt Corporation, as such activities are later described in this opinion. The United States Supreme Court described the activities of International Shoe Company as follows:

"Appellant has no office in Washington and makes no contracts either for sale or purchase of merchandise there. It maintains no stock of merchandise in that state and makes there no deliveries of goods in intrastate commerce. During the years from 1937 to 1940, now in question, appellant employed eleven to thirteen salesmen under direct supervision and control of sales managers located in St. Louis. These salesmen resided in Washington; their principal activities were confined to that state, and they were compensated by commissions based upon the amount of their sales. The commissions for each year totaled more than $31,000. Appellant supplies its salesmen with a line of samples, each consisting of one shoe of a pair, which they display to prospective purchasers. On occasion they rent permanent sample rooms for exhibiting samples, in business buildings, or rent rooms in hotels or business buildings temporarily for that purpose. The cost of such rentals is reimbursed by appellant.

"The authority of the salesmen is limited to exhibiting their samples and soliciting orders from prospective buyers, at prices and on terms

fixed by appellant. The salesmen transmit the orders to appellant's office in St. Louis for acceptance or rejection, and when accepted the merchandise for filling the orders is shipped F. O. B. from points outside Washington to the purchasers within the state. All the merchandise shipped into Washington is invoiced at the place of shipment from which collections are made. No salesman has authority to enter into contracts or to make collections.". 326 U.S. at pages 313, 314, 66 S.Ct. at page 157.

This Court recognizes that there are elements of fact in that case which are not present in the case at bar. The salesmen in that case resided in the state where process was served. The defendant Lewyt Corporation's sales manager resided in Illinois. This Court, however, does not think his place of residence is controlling. What he did in Michigan is the important consideration.

In holding that the International Shoe Company was amenable to process in Washington, the United States Supreme Court said:

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations. * * *

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." 326 U.S. at page 319, 66 S.Ct. at page 159.

■ Against the above background of law, it is important now to review the facts of this case. Defendant's activities so exceeded mere solicitation of sales in Michigan as to make it amenable to Michigan writs. The following are the material facts as this Court finds them from the affidavits and the testimony:

(1) The defendant, Lewyt Corporation, is a New York Corporation, and enjoys a large business throughout the United States. It conducts its business in Michigan principally through distributorships, to whom it sells its product, vacuum cleaners. These distributors, in turn, sell to dealers, who sell the cleaners at retail. Its business in Michigan has been substantial and continuous over the past ten years, during which time it sold some 52,554 vacuum cleaners, totalling just less than two million dollars of gross revenue. In the year 1954, prior to its contractual relationship with plaintiff, the defendant's sales in Michigan were $199,290; in the first year of plaintiff corporation's distributorship, the sales of defendant's product in Michigan amounted to $248,265. The 1956 sales amounted to $210,175. In the first nine months of 1957, and up to the time of cancelling its contract with plaintiff, the sales amounted to $109,550. The evidence offered by defendant indicated that Michigan sales constituted only three and one-half percent of the national sales. This representative percentage is not of great importance, and does not detract from the fact that the

defendant was doing a substantial and continuous business in Michigan.

(2) The defendant's representative in Michigan was Melvin J. Reibert, who was designated District Manager for a district which comprised Michigan and several of its neighboring states. Reibert's home was in Illinois. During the years 1955, 1956, and the first ten months of 1957, he was present in Michigan on company business on ninety-eight different days. Defendant's affidavits and testimony of its witnesses, were to the effect that Reibert's authority was entirely limited to solicitation of sales, with no authority to make or negotiate contracts, or to bind his company in any way. The testimony, however, discloses that his activities were not limited to mere solicitation of sales.

(3) The plaintiff corporation was interested in obtaining a distributorship for the handling of defendant's product, and its representatives made contact with representatives of the defendant in Chicago. After the defendant became interested in making a contract with plaintiff corporation, its District Manager, Reibert, visited in Michigan with plaintiff's representatives and discussed and reviewed, in detail, the terms of the contract which plaintiff would be required to sign in order to obtain a distributorship. It is true that Reibert did not have authority to finally negotiate, conclude and sign such contract. He was, however, the spokesman for the defendant in discussing terms of the contract with the plaintiff. Such discussion was had in Michigan, although the contract, itself, was finalized in New York, in October, 1955, by signature of defendant's officials.

(4) The terms of the contract so signed appear to this Court to be of great importance in its determination that defendant corporation was, in fact, doing business in Michigan. By this contract, the defendant corporation exercised a substantial amount of control over the activity of the plaintiff corporation in Michigan. Some of the things that the distributor was required to do, or not to do, were the following:

(a) To establish and maintain a place of business and salesroom satisfactory to Lewyt, giving Lewyt the right to inspect the place of business and to audit all records and accounts relating to the sale of Lewyt's products.

(b) Distributor was required not to sell vacuum cleaners of certain types, other than those manufactured by Lewyt.

(c) To maintain an efficient delivery and service organization satisfactory to Lewyt, including a stock of Lewyt vacuum cleaners and parts adequate to care for installations and servicing of Lewyt vacuum cleaners sold in the territory.

(d) Distributor was not to sell, offer for sale, or use in the repair of any Lewyt vacuum cleaner, second hand parts or used parts not manufactured by Lewyt.

(e) Distributor agreed to employ at least one person to be known as sales manager, who would devote his entire time to selling and promoting Lewyt products.

(f) Distributor was also to organize and maintain a sales and service organization satisfactory to Lewyt. The names and addresses of sales manager and other personnel were to be listed with Lewyt.

(g) Distributor was to report and list with Lewyt the names and addresses of all customers to whom the distributor sold Lewyt vacuum cleaners, and at the request of Lewyt to render an accounting of such sales.

(h) Distributor was to furnish Lewyt with information as to the status of its inventory of vacuum cleaners and parts; and to enable Lewyt to regulate production, distributor agreed to furnish the above information by using forms, routines, systems and procedures designed and set up by Lewyt.

(i) In case of termination of the distributorship, Lewyt, at its option, was to be subrogated to the rights of the distributor on all agreements and relationships existing between the distributor and dealers, or other representatives ap-

954

pointed by the distributor. It was required that all agreements made by distributor should contain a clause to make such agreement effective.

(j) The distributor was required to maintain Lewyt products in operating condition, free of cost to the customer or to Lewyt, for a period of one year from the date of sale; and was required to provide Lewyt's Department Store accounts (these not covered by the distributorship agreement) within distributor's territory with the same free service.

(k) Distributor agreed not to issue any Lewyt franchise without approval of Lewyt.

Through the instrumentality of this contract, was not the Lewyt Corporation present in Michigan, exercising a very large degree of control over the manner in which plaintiff corporation would conduct its own business in Michigan?

This contract also provided that it should be considered as a New York contract and that any acts done in fulfillment of it, "shall be construed as interstate commerce and not as business done by a foreign corporation in any state other than the state of New York." It does not appear to this Court that by such a provision the defendant corporation could escape the legal consequences of what it actually was doing.

(5) The original conversation between Williamson, of the plaintiff company, and the representatives of the defendant looking toward a distributorship, took place in Chicago. Following that, and under the direction of his superiors, Mr. Reibert came to Detroit and followed up the plaintiff's solicitation of this franchise, and did visit with plaintiff's representatives in Michigan in connection with the establishment of the plaintiff as a distributor for defendant. Prior to concluding the negotiations, Mr. Reibert brought one Mr. Hinman to plaintiff's place of business and advised plaintiff's representatives that if they would make arrangements to employ Mr. Hinman, there would be no question of their being able to obtain the Lewyt franchise. Pur-

suant to this recommendation, Mr. Hinman was so employed by plaintiff as its sales manager for Lewyt products.

(6) Prior to the execution of the distributorship contract, Lewyt Corporation sent on sales bulletin binders, advertising material and other items for use by the distributor in handling sales of the defendant's product. While in Detroit and preliminary to making the contract, Reibert, for the defendant, discussed with the plaintiff, advertising policy relating to defendant's product. He also discussed the area extent of the distributorship, and indicated that when they were able to terminate an existing distributorship, the area of plaintiff would be extended. Reibert also made some direct contacts with prospective purchasers of the defendant's product. He called upon customers of the plaintiff with plaintiff's own sales representative.

(7) Reibert examined plaintiff's premises and discussed with the plaintiff's representatives the necessity of their providing service for the dealers in the Lewyt products who would bring in vacuum cleaners for service; that it would be up to the plaintiff to repair and service them promptly and expeditiously and get them back.

(8) Plaintiff made regular reports to the defendant corporation. On one occasion at the request of Reibert, the plaintiff sold and shipped to another Lewyt distributor in the State of Minnesota, a quantity of vacuum cleaners out of its own stock on hand in Detroit.

(9) During the course of the dealings between plaintiff and defendant, the defendant joined in various things done by plaintiff to promote sales. There was a Christmas bonus program carried out in 1956 in which for special accomplishment in sales, employees of plaintiff were paid a bonus by defendant, Lewyt Corporation. From time to time, other programs of promotion were carried on in co-operation between plaintiff and defendant. These are described in the testimony. A joint advertising fund was maintained in New York, which was used to reward dealers and salesmen of dealers handling

Lewyt products, and certain advertising was paid out of this joint fund. Necessarily, all of these activities related to business being carried on by the plaintiff in the State of Michigan. At one time, a meeting was had in the City of Detroit at which one of the Lewyt people, in addition to Mr. Reibert, discussed the introduction of a new model vacuum cleaner, a promotional model, and all phases of the programming of this were taken up at that meeting.

(10) Following the termination of the distributorship contract with plaintiff, defendant had under consideration the re-purchase of the existing inventory of its product on hand in plaintiff's place of business. Defendant's area manager, Reibert, went to plaintiff's place of business for the purpose of finding out the amount and condition of plaintiff's inventory. It is claimed that he had no authority to make any final decision in this regard. It is assumed, of course, that he was sent to obtain information necessary to the defendant's decision as to possible re-purchase of this inventory.

Other things were done by the defendant through Reibert, but the above gives a fairly good picture of the character of the activities that were carried on in Michigan by the defendant which were in addition to the mere solicitation of sales. Determination of the question before the Court is not necessarily dependent upon the quantum of the foreign corporation's activities, or, necessarily, the quality of separate transactions; but in resolving this question, the Court should take into consideration both of these elements. It appears, therefore, to this Court that this defendant's activities in addition to mere solicitation of sales, were of such kind and of such extent and continuity as to justify the conclusion that the defendant corporation was present in Michigan so as to be amenable to the processes of its courts.

Much less than is present in this case, led the Supreme Court of Michigan, in the case of A. Harvey's Sons Manufacturing Co. v. Sterling Materials Co., 247 Mich. 317, 225 N.W. 538, to conclude that a foreign corporation was doing business in Michigan so as to subject it to Michigan jurisdiction. In that case, the defendant, Sterling Company, had neither an office or warehouse, and kept no stock of goods in Michigan. A commission salesman called upon plaintiff and sold it a quantity of roofing material. Upon receiving a complaint with reference to the goods sold, defendant sent one of its representatives to Michigan to meet with plaintiff for the purpose, as expressed in its letter,

> "In order to give you all of the necessary information pertaining to our roofing, the best method to adopt in merchandising it as well as to assist you with whatever prospects you may have, we are instructing one of our representatives to call for an interview. He will be in your city the end of this week or early part of next week."

The representative came on and was served with process. The Supreme Court of Michigan held that service was good and that the defendant was amenable to such process. This Court is of the opinion that the activities of the defendant in the case at bar were equivalent, both in quantity and quality, to the above described activities of the Sterling Company.

Defendant has emphasized that its representative, Reibert, had no authority to conclude contracts or sales, or otherwise to bind it; that all matters had to be referred to the home office in New York. It does not appear to this Court that that fact should insulate this corporation from a finding that it was, in fact, in Michigan. The following language of the Court of Appeals for the District of Columbia in the case of Frene v. Louisville Cement Co., supra, [77 U.S.App.D.C. 129, 134 F.2d 515] is helpful on this point:

> "It is now recognized that maintaining many kinds of regular business activities constitutes 'doing business' in the jurisdictional sense, notwithstanding that they do not involve concluding contracts. In other words, the fundamental prin-

ciple underlying the 'doing business' concept seems to be the maintenance within the jurisdiction of a regular, continuous course of business activities, whether or not this includes the final state of contracting."

The Court has reviewed other Michigan and outside authorities cited by the defendant in its brief in support of the motion, and is of the opinion that none of them detract from this Court's conclusion that this defendant was doing business in Michigan to such an extent as to subject it to service of process here. The Court, likewise, is satisfied that the service upon Reibert, as an agent of the defendant corporation, was proper under the Michigan Statute (M.S.A. § 27.761, C.L.1948, § 613.31).

An order denying defendant's motion, to conform with this opinion, may be presented for signature.